# Case No. 7,444.

## In re JONES.

[6 Biss. 68;[1] 9 N. B. R. 556; 6 Chi. Leg. News, 271.]

District Court, W. D. Wisconsin. April 21, 1874.

Gregory & Pinney, for assignee.
Vilas & Bryant, for Mrs. Jones.

HOPKINS, District Judge. At the hearing, the creditor, Mrs. Jones, offered her husband, David W. Jones, as a witness in her favor. He was objected to by the counsel for the assignee as incompetent, and the court sustained the objection, following the construction given by the supreme court of this state to the statute relating to evidence. Farrell v. Ledwell, 21 Wis. 182.

The court there hold that the exclusion of husband and wife as witnesses for each other in civil suits, is not based solely on interest, but rests upon principles of public policy, and as the statute only removes the ground of interest, the ground of public policy still renders them incompetent. White v. Stafford, 38 Barb. 419; Hasbrouck v. Vandervoort; 5 Seld. [9 N. Y.] 153.

I thought it best to notice my ruling on that question with a reference to the authority upon which I relied before going into the merits of the case.

The proof filed states that the bank-

---

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

rupt collected and received money belonging to her as her separate estate, at various times, from the 25th of March, 1865, to the 10th of July, 1871, amounting in the aggregate to $31,662.82, which, with the interest up to the adjudication of bankruptcy, amounted to the sum of $39,412.63; and further states that no part had been paid except $1,267.22, which he paid to her in notes of other parties.

It is further stated in the proof that he purchased certain real estate with the money, in this state and Iowa, but took the title in his own name, and which had been transferred to the assignee; so that all she had ever received to be applied upon said sum was the $1,267.22 above mentioned, which she claims should be applied thereon.

The way this proof is drawn, it throws very little light upon the real transaction as it appears from the evidence submitted on the hearing before me. And in order to understand the case and my conclusions upon the testimony, it becomes necessary to give a brief statement of the facts proven.

Col. Jones, the bankrupt, in November, 1845, married the claimant, a daughter of John Dunn, deceased, of the state of Kentucky, where the marriage was celebrated. The claimant's father died several years before that time, leaving a will by which he directed his executors to convert his personal property, except slaves, into money, to be equally divided between his son Frank and his four daughters, and when his daughters married, directed that the portion of such one should be put into her possession or into the hands of a trustee or trustees for her benefit, at the discretion of the executors; that as to the slaves, it provided that the executors should place an equal proportion of them in the possession of such daughter or into the hands of trustees for her benefit, or should continue to hire the same out for her benefit, and pay to her the hire yearly, but this distribution was not to take place until after the death of the wife of the testator, who was to have the use during her life. She died in 1850. Soon after their marriage they removed to Wisconsin, where they have ever since resided.

The share of each distributee under the will was ascertained, and settled June 13, 1852, to be $2,079. The claimant's portion had all been paid to her before her marriage (and spent, according to the testimony), except $100 paid to her Nov. 28, 1846, $101.95, Dec. 1, 1846, $100, Jan. 13, 1847, and $453.14 paid to her husband in 1853. She receipted for the first three sums, and her husband for the last. There is no direct evidence as to what she did with the amount thus paid to her. She may have intended to have conveyed the idea in her testimony that she handed it over to her husband, but she does not say so, and what she does say in reference to it is so confused and uncertain that I cannot place any reliance upon it. Soon after the parties removed to this state, Col. Jones commenced buying real estate, and shortly became a very extensive land-owner, and as early as 1856 had the reputation of being a man of large property.

Among other property, he bought what was called the "Belmont Farm," consisting of about 1,300 acres of land, for which he paid, as appears by the consideration expressed in the deeds, about $6,000. He lived upon and cultivated and improved this farm for several years before 1857, at which time he left it. He was elected secretary of state in 1856, and in 1857 removed with his family to Madison, where he continued to reside for about four years. He bought a house in Madison valued at about $3,000 or $4,000. After his term of office expired he returned to Mineral Point, and continued to rent his farm aforesaid. In 1865 he sold this farm to one Owen Wright, for $25,000 —$1,000 cash down, and notes and mortgage for $24,000. These notes and mortgage were made payable to the claimant, Mrs. Jones, and, as I understand the case, the debt proven is based upon the idea that this mortgage and the money secured thereby became hers, and that as Mr. Jones afterwards collected the money and used it himself, she proves up against his estate the amount thus collected of principal and interest. On the hearing she predicated her right to the money upon the grounds, first, that the property was originally purchased and paid for with her separate property, upon the agreement or understanding that it should be hers; and second, that Col. Jones advanced and settled that amount upon her as and for her separate estate.

As to the first ground, it is sufficient to say the testimony is insufficient to support it. The portion of her separate estate received by her husband was only $453.14, and that was in 1853, after the most of this land was bought, and as it cost about $6,000, the insignificant amount of her separate estate would not go far towards paying for it. Indeed, the case is destitute of any satisfactory testimony to support this ground of her claim. Her own testimony, vague and uncertain as it is, does not establish a semblance of a case to sustain that ground.

As to the second ground, it is undoubtedly the well-settled law that a husband out of debt may settle upon his wife such portion of his estate as he pleases, if done in good faith, and not to defraud subsequent creditors. Sexton v. Wheaton, 8 Wheat. [21 U. S.] 229. So it becomes necessary to consider the testimony, and see whether this was in fact a settlement or not.

I do not think the evidence sustains the claim that this Wright mortgage of $24,000, given for the "Belmont Farm," was intended as a settlement by the bankrupt upon his wife, and the evidence as above stated is altogether insufficient to show that the farm was originally purchased with her separate

funds, as showing any reason for such an act on his part. There was no language used by any one at the time the mortgage was given, to justify the conclusion that it was designed as an advancement to her. The reason assigned by him for taking the mortgage in her name, as Mr. Wright testifies, was that he was going south, and if he should die she could settle her own business better without having any administration about it, as he said he had seen considerable swindling in settling up estates, and Mr. Read, the counsel of the claimant, says he heard him say he took it in her name to secure her for the money he had that belonged to her.

This is all the testimony on that subject, except some vague statements of Mrs. Jones, and there is not enough evidence to support the claim that it was intended as a settlement of that amount upon her.

The subsequent conduct of the parties negatives also any such idea. It does not appear that she ever had the notes or mortgage in her possession. Col. Jones collected the money and used it as his own, deposited it with his other money in the bank, and purchased land with some of it and took the title thereto in his own name, and used it as he saw fit. About $4,000 of it was paid to Mrs. Jones at one time in his absence; she gave a receipt for it in his name, and then deposited it to his credit in the bank. Over $20,000 of that money was deposited with Mr. Henry, the banker, in Col. Jones' name, and no intimation was ever made to him, or to any one else, that it belonged to his wife, and neither of them kept any account of the time or amount of the payments. This conduct disproves the claim that it was intended as a bona fide payment to, or settlement upon, the wife, even laying out of view the claims of creditors. But when considered with reference to the rights of parties dealing with and crediting Mr. Jones, after that transaction, it presents a case that can not receive the approval of any court. She allowed him to collect, deposit, and use the money when collected as his own, and to enjoy the credit and reputation that the reception and use of the money necessarily gave him; and after parties have dealt with him, supposing and believing he was the owner of such money, she can not be heard to assert her right to it, and thus defraud honest creditors who have trusted him, relying upon the truth of appearance of ownership which she permitted him to present. Nor is this all that militates against the verity of this claim. After he had gone into business and obtained large credit, and became embarrassed and unable to pay his debts, she, instead of asserting her claim, joined with him in deeds of conveyance of all his real estate to his children, and thus attempted to aid him in placing his property in the names of his children, to defraud his creditors, and keep it in the family, instead of trying to get it to pay her claim; and

after he had thus fraudulently conveyed his property, he absconded, taking with him some considerable money obtained upon notes and securities of the firm of D. M. Platt & Co., which were transferred to him to collect and pay over to the creditors of that firm. As far as Mr. Jones is concerned, the evidence shows, beyond question, that he attempted to cheat and defraud his creditors, and the creditors of D. M. Platt & Co., out of their debts. Certainly, as to Mr. Jones, the fraud is clearly proven, and it is equally as plain that his wife co-operated with him in accomplishing it.

Neither of them pretended that she had a claim of this kind until after the scheme adopted to defraud the creditors by such deeds had been foiled by the institution of proceedings in bankruptcy. But when it became apparent that the grantees in those deeds could not hold the lands from the creditors, this new claim or pretense was set up. Then it was first given out that he owed a debt to his wife for money he had received, belonging to her, and that this mortgage was intended as an advancement.

The case shows that they were not lacking in resources and schemes to accomplish what they had manifestly undertaken, to wit., to defraud the honest creditors of Mr. Jones and of D. M. Platt & Co. In arriving at this conclusion I have to disregard a good deal of the testimony of Mrs. Jones, but I feel justified in so doing. It is so contradictory, inconsistent, and unnatural in many of the most material points, that I feel compelled to reject and discredit it. [Her recollection is so defective and imperfect about matters that would seem to have been of such a nature as to be indelibly fixed upon the memory, such as, for instance, the amount she received from her father's estate, and as to whether it was paid to her or her husband. These, together with many other important discrepancies and contradictions, force me to totally discredit and reject her evidence when it is not corroborated. It may be that she has not intended to testify to anything but the truth; that the inconsistencies result from her impaired and imperfect memory of the facts of the case which she attempts to relate, and I am inclined to adopt this as an excuse or explanation in her behalf; but it nevertheless renders her testimony incredible. I therefore, upon the evidence, must reject her claim to the $24,000 mortgage of Owen Wright, and hold that it was the property of D. W. Jones and not hers, and that it was not settled upon her as and for her separate property, but simply taken in her name to provide against the contingency of his death while on his contemplated trip south.] [2]

This brings me to a consideration of the claim, based upon the theory that Col. Jones received certain property and money belong-

---

[2] [From 9 N. B. R. 556.]

ing to her that came from her father's estate. The counsel for the assignee examined with a great deal of learning and ability, the will of Mrs. Jones' father, under which she received the property, for the purpose of showing that it was given to her directly, and not to trustees for her benefit and use; or, rather, to show that the executors had a discretion as to whether to deliver it to her or to her and her husband, and that, as the case showed they delivered to Mr. Jones, after the marriage, the portion belonging to her, they thereby executed that discretion in favor of the husband, and that it was not therefore to be regarded as her separate property, but as the property of Mr. Jones. In this case the parties were married before the married woman's act of Kentucky was passed, and after the death of the testator. But I do not consider it important to pass upon those questions, for, as to a portion of the estate, she did not become possessed of it until after removal to this state, nor until after the married woman's act was adopted here. Indeed as it appears, all that her husband received was after the passage of that act; and as by the terms of the will the executors were to convert the personal property into a fund, to keep it and distribute it, etc.. I think the title remained in the executors until it was distributed, and if so, it did not come to her until after the passage of that act, which gave it to her free from the claim or control of her husband. Burr v. Sherwood, 3 Bradf. (Sur.) 85. The counsel of the assignee claimed that the husband's right to it had attached before the passage of that act, and that the act, so far as his right was concerned, was unconstitutional, and cited to that effect the case of Westerveldt v. Gregg. 12 N. Y. 202. Without questioning the correctness of the doctrine laid down in that case, I think this case is distinguishable from it in this: In that case there was an unqualified bequest to the wife, and it was held that such a legacy was to be regarded as a chose in action, like a promissory note, and that, as a husband has a right to reduce his wife's choses in action to possession, and to assign them before so doing, that he had such a vested right as the legislature could not cut off, by declaring that it should be the separate property of his wife. But in this case the trustees were to first determine whether to pay the portion to the daughter or to trustees, or to her and her husband, and, hence, until they had exercised that discretion, the husband had no vested interest in it. The right of the husband was in abeyance, awaiting the decision of the executors upon this question, as to whom the money should be paid, and this discretion was not exercised until after the passage of the married woman's act in this state. So I think, under the terms of this will, the husband had not such a vested interest in the wife's distributive share as the constitution would protect from the operation of that act.

But the case of Westerveldt v. Gregg, supra, disposes of the claim for the amount of the Frank Dunn note. The evidence shows that Mrs. Jones, before she was married, loaned to her brother Frank $436.80, for which he gave her his note, and that he afterwards paid it to Col. Jones. I think that the husband had such a vested interest in that note, by virtue of the marriage contract, that the legislature could not take it away from him, and declare it to be the sole and separate property of the wife, without violating the provision of the constitution which declares that no person "shall be deprived of his property without due process of law." That being the case, it was his property, and he is not liable to her for it, nor can she prove the same against his estate in bankruptcy. The testimony further shows that on the 31st of March, 1863, $182 was paid to Col. Jones by the executors, as his wife's share of the proceeds of certain lands belonging to the estate, which were sold by the executor. This, together with the $453.14, paid in 1853, amounting in all to the sum of $635.14, I think properly chargeable to the estate of D. W. Jones, and I authorize her to prove a debt for that amount against his estate.

The claim for the hire of her two slaves, from January, 1851, to December, 1865, when they were emancipated, I do not think is sustained by either the evidence or the law. It appears that in January, 1851, two slaves were apportioned to her, and that the executor kept them and hired them out for her benefit under the authority and directions in the will hereinbefore mentioned. The executor says they earned from $100 to $150 each annually, and that he remitted the proceeds after paying taxes and expenses to Mr. David W. Jones. These slaves were clearly her separate property, and the hire was for her benefit and use, but she permitted her husband to receive it and use it for a period of over fifteen years, and never kept any account of the amount or time of its reception, and, indeed, according to her testimony, she did not seem to have any idea of what this hire amounted to, for she swears it was $500 a year, when, as before stated, it did not exceed $250.

The doctrine in equity is too firmly established to be now questioned, that a married woman may bestow the income of her separate property upon her husband, at least, when done freely and without undue influence; and the rule is equally well settled, by a long and almost unbroken line of decisions in both this country and England, that where the husband, by the consent of his wife, is in the habit of receiving the income, profits and dividends of her separate estate, such facts and transactions are regarded as showing her voluntary choice to thus dispose of them for the use and benefit of the family, and the law will not require him to account therefor beyond the amount received during

the last year. 2 Story Eq. Jur. § 1396; Methodist Church v. Jaques, 3 Johns. Ch. 1; Parkes v. White, 11 Ves. 225. [Perry, Trusts, § 665; Squire v. Dean, 4 Brown, Ch. 326.] [3]

This doctrine effectually disposes of the claim for hire of the slaves, and any claim for interest on the principal paid to her husband. But, as I have before said, the fact that no account was kept by either party of the amount of the money received from that source for so long a period, strengthens the presumption of the law that the wife intended her income to be used for the benefit of the family. In such case the law does not imply an agreement to repay it.

This rule, it will be observed, applies only to the income of her separate estate. But for the amount of $635.14, received by the husband as a part of the principal, I think a different rule prevails. In re Bigelow [Case No. 1,398]; In re Blandin [Id. 1,527]; Jaycox v. Caldwell, 51 N. Y. 395. She admits in her proof that she has received notes and mortgages for $1,267, to apply on her indebtedness. If so, the above sum of $635.14 should be deducted from that, and she should pay the balance to the assignee; but I will not definitely determine that question at this time, but will leave it open for the claimant and assignee to make such disposition of it as they may deem just and proper. Her debt proven is ordered expunged from the list of creditors.

As this claim of the wife for the amount proven is so groundless and destitute of any semblance of justice or merit, I deem it but just, and as my duty to the creditors of the estate, to charge her with the costs of this proceeding, to be taxed, including a docket fee of $20 to the attorney for the assignee.